UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN DAU and REBECCA LA RUE, as Successors in Interest to RUTH ANN HALL and MARSHA DAU,<br><br>                              Plaintiffs,<br><br>    vs.<br><br>COUNTY OF IMPERIAL; et al.,<br><br>                              Defendants. | CASE NO. 12cv0432 DMS (PCL)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**[Docket No. 97]** |

   This case comes before the Court on the motion for summary judgment filed by Defendants California Forensic Medical Group, Inc., John H. Baker, Jr., M.D., Elisa Pacheco, R.N., County of Imperial, Imperial County Sheriff's Department, Raymond Loera, Jose Murguia and Prabhdeep Singh, M.D. Plaintiffs filed an opposition to the motion, and Defendants filed a reply. For the reasons set out below, the Court grants in part and denies in part Defendants' motion.

**I.**

**BACKGROUND**

   On July 1, 2011, Marsha Dau was arrested on federal charges, and admitted to the Imperial County Jail. Upon arrival at the jail, personnel from Defendant California Forensic Medical Group ("CFMG") completed an Intake Triage Assessment form for Ms. Dau. (Decl. of Angela Zugman in

///

///

Supp. of Opp'n to Mot. ("Zugman Dec."), Ex. D at 167-68.)[1]  According to that form, Ms. Dau had a history of fibromyalgia, panic attacks and lung cancer. (*Id.*) She arrived at the jail with valium and suboxone, both of which were taken from her and placed in a sealed lock up. (*Id.*) As part of her assessment, Ms. Dau was referred to the medical doctor and to a mental health professional. (*Id.*)

Medical records reflect that Ms. Dau received a seven-day prescription for Naproxen and Ultram upon her initial assessment. (*Id.* at 173.) Later that day, she received a three-day prescription for Valium and a five-day prescription for Suboxone. (*Id.*)

On July 2, 2011, Ms. Dau filled out a request for medical services. (Decl. of Prabhdeep Singh, M.D. in Supp. of Mot. ("Singh Decl."), Ex. H.) Specifically, Ms. Dau requested premarin, and stated that her glasses had been confiscated and she could not see. (*Id.*)

On July 5, 2011, Ms. Dau was seen by Defendant Prabhdeep Singh, M.D., an independent contractor for Defendant CFMG. (*Id.*) During that evaluation, Dr. Singh noted Ms. Dau was complaining of pain and anxiety. (*Id.*) He also noted her blood pressure was elevated. (Singh Decl. ¶ 14.) Dr. Singh ordered that Ms. Dau be placed on a Clonidine protocol to monitor her blood pressure. (*Id.*) He also continued her prescription for Naproxen, increased her prescription for Ultram and wrote her a prescription for Tylenol. (Zugman Decl., Ex. D at 173.) Dr. Singh states that he discontinued Ms. Dau's Suboxone during this visit. (Singh Decl. ¶ 17.)

Dr. Singh did not see Ms. Dau again after this visit. He was on vacation from July 14, 2011, to July 22, 2011. While Dr. Singh was on vacation, Uri Guefen, M.D. performed Dr. Singh's duties at the jail. Dr. Guefen was not advised of Ms. Dau's condition during that time.

On July 7, 2011, Ms. Dau was seen by Defendant John Baker, M.D., also an independent contractor for Defendant CFMG. (Decl. of John Baker, M.D. ("Baker Decl.") ¶ 2.) Dr. Baker performs telepsychiatry for prisoners, which involves the prisoner being taken to a private setting, where she is accompanied by a psychiatric nurse, and the use of a video feed that allows Dr. Baker to observe and communicate with the prisoner and the nurse. (*Id.* ¶¶ 5-7.) This is the procedure that was used for Ms. Dau's appointment with Dr. Baker on July 7, 2011. Ms. Dau was accompanied by

---

[1] The Court notes the parties' exhibits are not numbered consecutively as required by Civil Local Rule 5.1.e. Accordingly, the page numbers cited are those listed on the bottom right corner of the exhibit.

Madell Landrum, R.N., who informed Dr. Baker that Ms. Dau was having "pain issues and was on Suboxone." (*Id.* ¶ 6.)[2] Dr. Baker noted Ms. Dau's issues at the time were "physical problems," and his plan was for Dr. Singh to manage her care. (Baker Decl., Ex. B.)

Over the next few days, nurses checked Ms. Dau's blood pressure and administered her Naproxen, Tylenol and Ultram. (Decl. of Elisa G. Pacheco, R.N. in Supp. of Mot. ("Pacheco Decl."), Exs. C, E.) On July 11, 2011, Ms. Dau reported to medical personnel that she thought she was having a seizure. (Zugman Decl., Ex. D at 188.) Ms. Dau was reported to be hyperventilating and was very anxious and upset. (*Id.*)

One of the nurses involved in Ms. Dau's care was Defendant Elisa Pacheco, R.N. On July 12, 2011, Ms. Pacheco attempted to administer Ms. Dau's medications, but Ms. Dau refused. (Pacheco Decl., Ex. C.) Later that day, Ms. Dau was taken to the medical unit for evaluation. (Zugman Decl., Ex. D at 189.) At that time, Ms. Dau was observed to be hyperventilating, and was very anxious. (*Id.*) She was thereafter placed in a safety cell "for bizarre and aggressive behavior[.]" (*Id.* at 174.) Ms. Dau's chart reflects the need for a psychiatric sick call, (*id.*), but there is no evidence that either Dr. Singh or Dr. Baker was informed of that request.

Ms. Dau remained in the safety cell for three days. (*Id.* at 195-200.) When she first arrived, she was reported to be "very anxious" and aggressive. (*Id.* at 195.) The next day she was reported to be much better, but still a little anxious. (*Id.*) Later that day, Ms. Dau refused to have her vital signs taken, and she was observed sitting and then lying on the ground. (*Id.* at 196.) While in the safety cell, Ms. Dau continued to refuse to have her vital signs taken, was reported to be "belligerent" and "agitated," and was also noted to be "talking to herself." (*Id.* at 197.) On July 15, 2011, Ms. Dau was cleared from the safety cell and returned to the general population. (*Id.* at 199.) The following day, she was placed in administrative segregation for "bizarre behavior." (Zugman Decl., Ex. G.)

It appears Ms. Dau was returned to her cell the following day, where she was found naked on her bed and wrapped in a sheet. (Zugman Decl., Ex. D at 190.) Ms. Dau's clothes were in the toilet with feces on them, and urine was found all over the floor of her room. (*Id.*) She was transported to

---

[2] The Court notes Ms. Landrum's information on the Suboxone is in conflict with Dr. Singh's testimony, which states he discontinued the Suboxone on July 5, 2011.

- 3 - 12cv0432

the medical unit, where she was found to have feces on her back, buttocks and feet.  (*Id.*)  She was unaware of her condition, and appeared to be confused.  (*Id.*)  It appears Ms. Dau was then placed in a safety cell, and returned to her cell the following day.  (*Id.*)

Over the next two days, Ms. Dau refused to have her vital signs taken and she refused her medications.  (Pacheco Decl., Ex. C.)

On July 20, 2011, Ms. Dau was returned to the medical unit because she was found in her cell talking to herself and acting bizarrely.  (Zugman Decl., Ex. D at 190.)  Ms. Dau was placed back in the safety cell for "bizarre behavior and possible danger to others."  (*Id.* at 175.)  She continued to refuse to have her vital signs taken, refused to answer the nurse's questions and was exhibiting aggressive behavior.  (*Id.* at 202.)  Ms. Dau was noted to be lying down naked in the safety cell.  (*Id.*)  She was later found to be shaking and reported being cold.  (*Id.* at 203.)  She also continued to refuse her medications.  (*Id.*)  Her medical records reflect that Dr. Singh was notified of her condition, (*id.* at 201), but he was on vacation at the time and denies he received any notification of Ms. Dau's condition.  (Singh Decl. ¶ 19.)

Ms. Dau's court-appointed attorney visited Ms. Dau in the safety cell on July 20, 2011.  (Zugman Decl., Ex. P at 37.)  He "thought she looked dehydrated.  She looked very pale.  She looked weak."  (*Id.* at 40.)  When he entered the cell, Ms. Dau did not sit up or try to cover her naked body.  (*Id.* at 42.)  In his words, "she looked like she didn't have a lot of energy.  She just laid there.  When I first talked to her, I don't think she was really coherent."  (*Id.*)  Ms. Dau's attorney observed Ms. Dau talking "to somebody who wasn't there," and then saw her urinate on herself.  (*Id.* at 43-44.)

After this visit, Ms. Dau's attorney called Ms. Dau's family members to express concern for Ms. Dau's well-being.  (*Id.*)  Ms. Dau's mother, Ruth Hall, then called the jail to inquire about her daughter's condition, but was told to call back.  (Zugman Decl., Ex. Z.)

Ms. Dau remained in the same condition through the following day, when she was seen by Dr. Baker, again through video feed.  (Zugman Decl., Ex. D at 193.)  Dr. Baker noted Ms. Dau was complaining of pain everywhere.  (*Id.*)  He also noted her thoughts were scattered, her mood was depressed, her speech was breathless, she was restless, she had a labile affect and her eye contact was
/ / /

1  poor. (*Id.*) Dr. Baker noted Ms. Dau was suffering from drug sequelae psychosis, and he prescribed
2  Haldol and Cogentin. (*Id.*)

3  The next day, Ms. Dau was noted to be "cooperative." (Zugman Decl., Ex. D at 205-06.) She
4  was again lying on the floor, and it was noted she needed a shower. (*Id.*) Her medical records also
5  reflect she was mumbling and not responding to questions appropriately. (*Id.* at 206.)

6  Early the next morning, Ms. Dau was observed sitting down in her cell, hands slightly shaky.
7  (*Id.* at 207.) Approximately four hours later, Defendant Murguia, the watch commander on duty,
8  observed Ms. Dau in the safety cell. (Decl. of Jose Murguia in Supp. of Mot. ("Murguia Decl.") ¶ 8.)
9  He states she "was awake and moving around the cell." (*Id.*) He "noticed nothing abnormal about
10 Ms. Dau's behavior or condition at that time." (*Id.*)

11 Less than two hours later, at approximately 9:00 a.m., Nurse Pacheco found Ms. Dau lying
12 down in her cell, not responding to verbal commands. (Zugman Decl., Ex. D at 207.) Ms. Pacheco
13 told one of the officers on duty to inform the watch commander to report to the safety cell. (*Id.* at H-
14 0111.) When Defendant Murguia arrived, Ms. Pacheco informed him that Ms. Dau needed to be
15 transferred to the hospital. (*Id.*)

16 Ms. Dau was unable to stand up to get dressed, so two officers dressed Ms. Dau. (Zugman
17 Decl., Ex. L at 54.) One of those officers was Diane Worthington. She stated that while dressing Ms.
18 Dau, Ms. Dau's body was tensing up and relaxing. (*Id.* at 59.) Officer Worthington and another
19 officer, Ramirez, then placed Ms. Dau in a wheelchair. (*Id.* at 60.) Officer Worthington noticed that
20 Ms. Dau's body continue to tense up, which caused her legs to lift up of the wheelchair, and then
21 relax, which caused her legs to bend. (*Id.* at 61.) Officer Worthington applied leg irons on Ms. Dau's
22 legs, and cuffed her hands to the leg irons. (*Id.* at 64-65.) Another officer on the scene, Martinez,
23 mentioned an ambulance. (*Id.* at 69.) Another officer, Romero, said to Nurse Pacheco, "She doesn't
24 look too good," to which Nurse Pacheco responded, "Oh, stop playing around." (Zugman Decl., Ex.
25 M at 31-32.) Officer Romero then said to Officer Worthington something to the effect of, "She [Ms.
26 Dau] looks dead." (Zugman Decl., Ex. L at 72.) Officer Worthington noticed Ms. Dau's head had
27 slumped forward. (*Id.* at 81.) She then wheeled Ms. Dau into a van for transport to the hospital. The
28 van was not equipped with any medical equipment, save for a first aid kit. (*Id.* at 75.)

Officer Romero then drove the van to the hospital, with Officer Worthington riding as a passenger in the back with Ms. Dau. (*Id.*) During the five- to ten-minute drive, Officer Worthington noticed that Ms. Dau stopped blinking, and she ceased responding to commands. (*Id.* at 76-77.) When they arrived at the emergency room, Ms. Dau's head was slumped forward, and she was still unresponsive. (*Id.* at 80-81.) Ms. Dau was then unchained from the wheelchair and moved to a bed where hospital personnel immediately began performing CPR. (*Id.* at 82.) Officer Romero states that one of the hospital personnel asked, "Why wasn't an ambulance called?" (Zugman Decl., Ex. M at 46.) At 9:56 a.m., after a few minutes of hospital personnel performing CPR, Ms. Dau was pronounced dead. (*Id.* at 50-51.)

An autopsy was performed on Ms. Dau on July 26, 2011. (Zugman Decl., Ex. B.) The autopsy showed Ms. Dau had a "3 cm, stage II decubitus ulcer" on her lower middle back. (*Id.*) The doctor who performed the autopsy opined that Ms. Dau "suffered from atherosclerotic cardiovascular disease which resulted in her ultimate demise. The results of toxicology also revealed an acute multiple drug intoxication which contributed to her death." (*Id.*)

On February 17, 2012, Ms. Dau's mother, Ruth Hall, filed the present case against Defendants County of Imperial, Imperial County Sheriff's Department, Sheriff Raymond Loera, California Forensic Medical Group, Inc., Dr. Baker and Nurse Pacheco. Dr. Singh and Corporal Murguia were named as Defendants in an amended complaint. Ms. Hall died on December 6, 2012, prompting her other children, Steven Dau and Rebecca LaRue, to pursue the case on her behalf. The Third Amended Complaint alleges the following claims against the following Defendants: (1) deliberate indifference to Ms. Dau's serious medical needs against all Defendants except Sheriff Loera, (2) negligent hiring, training, retention supervision and control against Defendants Loera and Murguia, (3) violation of Ms. Dau's due process rights against all Defendants, (4) violation of California Government Code § 845.6 against all Defendants and (5) violation of Ms. Hall's substantive due process rights against all Defendants.[3]

---

[3] The Court notes Plaintiffs' first and third claims appear to encompass the same offending conduct: Defendants' deliberate indifference to Ms. Dau's serious medical needs. Accordingly, the Court treats these separately pleaded claims as one claim for violation of Ms. Dau's Fourteenth Amendment right to due process under 42 U.S.C. § 1983.

## II.

## DISCUSSION

Defendants move for summary judgment on all claims asserted against them. They raise several arguments, all of which are addressed below.

**A.     Standard of Review**

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party has the initial burden of demonstrating that summary judgment is proper. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The moving party must identify the pleadings, depositions, affidavits, or other evidence that it "believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).

The burden then shifts to the opposing party to show that summary judgment is not appropriate. *Celotex*, 477 U.S. at 324. The opposing party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, to avoid summary judgment, the opposing party cannot rest solely on conclusory allegations. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). Instead, it must designate specific facts showing there is a genuine issue for trial. *Id. See also Butler v. San Diego District Attorney's Office*, 370 F.3d 956, 958 (9th Cir. 2004) (stating if defendant produces enough evidence to require plaintiff to go beyond pleadings, plaintiff must counter by producing evidence of his own). More than a "metaphysical doubt" is required to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

**B.     Deliberate Indifference to Serious Medical Need**

Plaintiffs' first claim alleges Defendants were deliberately indifferent to Marsha Dau's serious medical needs. Had Ms. Dau been convicted of a crime prior to her incarceration, this claim would be governed by the Eighth Amendment. Pretrial detainees and persons who have not been convicted, however, may raise conditions of confinement claims similar to those made by convicted persons

under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979); *Redman v. County of San Diego*, 942 F.2d 1435, 1440, n.7 (9th Cir. 1991) (*en banc*). The Ninth Circuit has held that the standard for analyzing the rights of pretrial detainees under the Due Process Clause is similar to that under the Eighth Amendment. *See Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998); *Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986). Indeed, a pre-trial detainee's due process rights are "at least as great" as the Eighth Amendment protections available to convicted prisoners. *Maddox v. Los Angeles*, 792 F.2d 1408, 1414 (9th Cir. 1986); *see also Lolli v. County of Orange*, 351 F.3d 410, 419 n.6 (9th Cir. 2003) (noting, but refusing to consider, question of whether a pretrial detainee's medical care claims, analyzed under the Eighth Amendment's deliberate indifference standards, were entitled to *more* protection than those of a convicted prisoner under the cruel and unusual punishments clause).

Prison officials violate a prisoner's Eighth Amendment right to be free from cruel and unusual punishment if they are deliberately indifferent to the prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989). "A determination of 'deliberate indifference' involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (*en banc*). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Id.* (quoting *Estelle*, 429 U.S. at 104).

> The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are indications that a prisoner has a "serious" need for medical treatment.

*Id.* at 1059-60. The second prong, or the element of "deliberate indifference," requires a showing of "a purposeful act or failure to act on the part of the defendant." *Id.* at 1060. In other words, "[a] defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established." *Id.*

///

1. Defendant Singh

Defendants argue Dr. Singh did not act with deliberate indifference in his treatment of Ms. Dau. In support of this argument, Defendants assert Dr. Singh "properly evaluated [Ms. Dau] and issued several orders that were designed to address her complaints of chronic pain, fibromyalgia and history of panic attacks." (Mem. of P. & A. in Supp. of Mot. at 24.) They also assert Dr. Singh's treatment of Ms. Dau met the standard of care, therefore he was not deliberately indifferent.

Notably, Defendants fail to cite any authority to support their argument that compliance with the general standard of care prohibits a finding of deliberate indifference. Although that evidence may be relevant to the issue of deliberate indifference, it is not dispositive of the matter. *See Gil v. Reed*, 535 F.3d 551, 557 (7th Cir. 2008) (stating reasonable jury could disregard opinion on standard of care and rely on other evidence to find deliberate indifference).

Furthermore, there is evidence from which a jury could find that Dr. Singh was deliberately indifferent to Ms. Dau's serious medical needs. Specifically, on the July 20, 2011 Nursing Assessment of Psychiatric & Suicidal Inmate Form, Defendant Pacheco wrote that she notified Dr. Singh of Ms. Dau's condition. (Zugman Decl., Ex. D at 201.) Although Dr. Singh's denies he was notified, this Form disputes that assertion. Viewing the evidence in the light most favorable to Plaintiffs, a jury could find that Dr. Singh was notified of Ms. Dau's condition, and yet he failed to intervene in her treatment. On this record, Defendant Singh is not entitled to summary judgment on Plaintiffs' deliberate indifference claim.

2. Defendant Baker

Defendants raise much the same argument with respect to Dr. Baker: namely, that his treatment of Ms. Dau was appropriate and met the standard of care. However, this argument fares no better for Dr. Baker than it did for Dr. Singh.

Unlike Dr. Singh, who only saw Ms. Dau once a few days after her admission, Dr. Baker saw Ms. Dau twice, albeit over a video feed, the last time being two days before her death. At that time, Dr. Baker noted Ms. Dau was complaining of pain everywhere. (*Id.* at 193.) He also noted her thoughts were scattered, her mood was depressed, her speech was breathless, she was restless, she had

///

a labile affect and her eye contact was poor. (*Id.*) Based thereon, Dr. Baker believed Ms. Dau was suffering from drug sequelae psychosis, and he prescribed Haldol and Cogentin. (*Id.*)

Defendants argue Dr. Baker's response to Ms. Dau's condition was reasonable and appropriate, but they have not shown there is no genuine issue of material fact as to whether he acted with deliberate indifference to Ms. Dau's serious medical needs. In the two weeks between his visits with Ms. Dau, her condition had deteriorated to the point where she was placed in a safety cell. In Dr. Baker's opinion, she went from a patient with purely "physical problems," (Baker Decl., Ex. B), to having drug sequelae psychosis. (Baker Decl., Ex. D.) Dr. Baker also noted that Ms. Dau was complaining of "pain everywhere," (*id.*), but he did nothing to treat those physical symptoms or her breathless speech. Construing the evidence in the light most favorable to Plaintiffs, Defendant Baker is not entitled to summary judgment on Plaintiffs' deliberate indifference claim.

### 3. Defendant Pacheco

With respect to Defendant Pacheco, Defendants argue she was not deliberately indifferent to Ms. Dau's serious medical needs, therefore she is entitled to summary judgment. As with Defendants Singh and Baker, however, the record fails to establish the absence of a genuine issue of material fact sufficient to warrant summary judgment in Defendant Pacheco's favor.

Of all the individually named Defendants, Defendant Pacheco had the most regular, consistent contact with Ms. Dau. She saw Ms. Dau the day she arrived at the jail. Defendant Pacheco dispensed Ms. Dau's medications, monitored Ms. Dau's blood pressure and took Ms. Dau's vital signs. Defendant Pacheco was aware that Ms. Dau routinely refused her medications and refused to have her vital signs checked. Defendant Pacheco was also aware of Ms. Dau's placement in the safety cell on July 12, 2011, and was directly involved in her placement in the safety cell on July 20, 2011, and her treatment thereafter. Despite her familiarity with Ms. Dau, Defendant Pacheco did not request that she be seen by either Dr. Singh or Dr. Baker until July 20, 2011, when she was placed in the safety cell for the second time.

Moreover, Defendant Pacheco was directly involved in Ms. Dau's care on the day she died. She observed Ms. Dau lying in the safety cell, as Ms. Dau had been doing for the past few days, not responding to verbal commands. Despite Ms. Dau's condition, Defendant Pacheco did not call for

1  a doctor, did not request an ambulance and did not call 911. Instead, she called prison officials and
2  made arrangements for Ms. Dau to be transported to the emergency room in a jail van that was not
3  equipped with any medical personnel or medical equipment. Ms. Dau was pronounced dead within
4  the hour. Construing this evidence in the light most favorable to Plaintiffs, Defendant Pacheco is not
5  entitled to summary judgment on Plaintiffs' deliberate indifference claim.

       4.      Defendant Murguia

7  The last individual Defendant on Plaintiffs' deliberate indifference claim is Defendant
8  Murguia. As mentioned above, Defendant Murguia was the watch commander on duty the day Ms.
9  Dau died. He was notified of Ms. Dau's condition and the need for her to be transported to the
10 emergency room. He thereafter reported to the safety cell where Ms. Dau was being housed, and
11 personally observed her condition and transportation into the van.

12 Defendants argue Defendant Murguia was not deliberately indifferent to Ms. Dau's serious
13 medical needs because he reasonably deferred to Defendant Pacheco's assessment of the situation, and
14 because the situation did not call for a response other than the one that was provided.

15 As to the latter argument, there is a genuine issue of material fact about the how the situation
16 unfolded on the morning of Ms. Dau's death. All of the prison personnel on the scene observed Ms.
17 Dau lying in the safety cell, unresponsive to verbal commands. According to Officer Worthington,
18 she had to personally dress Ms. Dau for transport because Ms. Dau was unable to do so herself. Some
19 of the prison personnel questioned whether Ms. Dau should be transported in an ambulance rather than
20 a van, and Officer Romero commented that Ms. Dau didn't "look so good," that she "looked dead."
21 These factual disputes about the situation confronting the officers on the morning of Ms. Dau's death
22 preclude entry of summary judgment in favor of Defendant Murguia.

23 Defendants' argument that Defendant Murguia was entitled to rely on the opinion of Defendant
24 Pacheco is, likewise, insufficient to warrant summary judgment. In *Long v. County of Los Angeles*,
25 442 F.3d 1178 (9th Cir. 2006), the county-defendant raised a similar argument, namely that its "policy
26 of reliance upon the trained professional doctors and nurses who worked in the [County Jail's Medical
27 Services Bureau] cannot amount to deliberate indifference because the alleged deficiencies identified
28 / / /

1 by [the plaintiff] fall within the province of medical and nursing schools[.]" *Id.* at 1187. The Ninth
2 Circuit held that:

> argument is contrary to this court's case law, which holds that, even where trained professionals are involved, a plaintiff is not foreclosed from raising a genuine issue of triable fact regarding municipal liability when evidence is presented which shows that the municipality's failure to train its employees amounts to deliberate indifference. Indeed, the County's argument would allow municipalities to insulate themselves from liability for failing to adopt needed policies by delegating to trained personnel the authority to decide all such matters on a case by case basis, and would absolve the governmental agencies of any responsibility for providing their licensed or certified teachers, nurses, police officers and other professionals with the necessary additional training required to perform their particular assignments or to implement the agency's specific policies.

*Id.*

Although the Ninth Circuit was specifically addressing municipal liability in *Long*, the reasoning applies with equal force to questions of individual liability. Just as the county-defendant in *Long* could not hide behind a policy of reliance on trained medical personnel to avoid a finding of deliberate indifference, Defendant Murguia cannot rely on the opinion of Defendant Pacheco to avoid responsibility for his own conduct. According to the record in this case, "[a]ll staff (custody and medical) have a duty to act and to provide medical aid (i.e. First Aid and/or CPR) to any person in need of such aid." (Zugman Decl., Ex. F, Policy and Procedure Number 2040.) Defendant Murguia was trained in CPR, (Zugman Decl., Ex. N at 26), presumably so he could perform it if necessary rather than simply deferring to the judgment of prison medical personnel. In light of *Long* and the record in this case, Defendant Murguia is not entitled to summary judgment on Plaintiffs' deliberate indifference claim.

### 5. Defendant County

Turning to Defendant County, Defendants argue it is entitled to summary judgment because there is no evidence to support the existence of the allegedly offending customs, policies or practices, and even if there is, those customs, policies or practices do not evince deliberate indifference.

The County "may be held liable 'when implementation of its official policies or established customs inflicts the constitutional injury.'" *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010) (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 708 (1978) (Powell, J. concurring)). In this case, there are three customs, policies or practices at issue: (1) the

1  County's failure to supervise CFMG's provision of health care services, (2) the County's custom or
2  practice of deferring to medical personnel on issues of inmate health and safety and (3) the County's
3  failure to train its officers on medical emergencies during transport. (Opp'n to Mot. at 23-24.)
4  Plaintiffs allege each of these policies was responsible for the violation of Ms. Dau's constitutional
5  rights.

6  On the first policy, the Court agrees with Defendants that there is no evidence to support the
7  existence of such a policy. Defendants have submitted evidence that Sheriff's Captain Jamie Clayton
8  personally attends "CFMG Quality Assurance meetings on behalf of the County to stay apprised as
9  to the appropriate quality of medical care being provided to ICJ inmates." (Decl. of Captain Jamie
10 Clayton in Supp. of Mot. ¶ 7.) Plaintiffs have failed to present any evidence in dispute, and thus, the
11 County is entitled to summary judgment on this claim to the extent it relies on this alleged policy.

12 Defendants do not dispute the existence of the second policy, namely that prison officials
13 routinely defer to medical personnel on issues of inmate health and safety. Rather, they argue there
14 is nothing unconstitutional about that custom, policy or practice. For the reasons set out in *Long*, and
15 in light of the record in this case, the County is not entitled to summary judgment on this claim to the
16 extent it relies on this alleged policy.

17 Finally, Plaintiffs allege the County has a policy, custom or practice of failing to train its
18 officers on medical emergencies during transport. Defendants assert there is no such policy. On the
19 contrary, they state, and the record reflects, that prison officials are trained in First Aid and CPR. In
20 response, Plaintiffs rely on the conduct of Officers Worthington and Romero, who transported Ms.
21 Dau to the emergency room. However, the conduct of these two officers during this particular
22 incident, standing alone, does not amount to a municipal custom, practice or policy. *See Trevino v.*
23 *Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (citations omitted) ("Liability for improper custom may not
24 be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient
25 duration, frequency and consistency that the conduct has become a traditional method of carrying out
26 policy.") Accordingly, the County is entitled to summary judgment on this claim to the extent it relies
27 on this alleged policy.
28 / / /

6. Defendant CFMG

Defendants raise the same arguments with respect to CFMG as they did for the County, namely that Plaintiffs have failed to identify any customs, policies or practices of CFMG, and even if they have, those customs, policies and practices are not unconstitutional.

Despite Defendants' argument, they readily identify the CFMG policies at issue in this case. (Mem. of P. & A. in Supp. of Mot. at 34.) They are found in Paragraph 73 of the Third Amended Complaint, which states:

> CFMG as an entity inadequately provides access to doctors and doctor supervision of the actual provision of health care services which results in actual harm to inmates. The psychiatrist, Dr. Baker, who sees patients via video link, does not evaluate medication records or care to confirm what medications have been provided by the internist, Dr. Singh. Dr. Singh does not consult with Dr. Baker about the medications he gives to patients. The doctors do not independently or routinely review the nurses' notes to see what adverse symptoms are being documented regarding inmate patients with health issues. These doctors are not notified regarding the placement of an inmate exhibiting bizarre behavior in an isolation/safety cell. The nurses select what limited, if any, medical documentation to provide the doctors. In addition, CFMG does not provide adequate coverage for when Dr. Singh is unavailable and allows CFMG nurses to evaluate, diagnose and give prescription medications to inmate patients in Dr. Singh's absence.

(Third Am. Compl. ¶ 73.)

Of these eight alleged policies, Defendants address only two, namely CFMG's alleged practice of not requiring doctors to evaluate each other's prescription records, and CFMG's alleged practice of having inadequate coverage for Dr. Singh when he is unavailable. As to the first, Defendants state the prescription records are contained in the prisoner's chart, and both doctors have access to it, if necessary. However, Defendants do not dispute there is a custom or practice of doctors not reviewing those records. In the absence of evidence to dispute that alleged policy, CFMG is not entitled to summary judgment on this aspect of Plaintiffs' claim.

On the second alleged policy or practice, Defendants state they provided coverage for Dr. Singh while he was on vacation, and they provide evidence in support. Plaintiffs do not dispute this evidence, and thus CFMG is entitled to summary judgment on this claim to the extent it relies on this alleged policy.

/ / /

/ / /

With respect to the remaining six policies, Defendants have not shown either the absence of the policies or that they did not result in the violation of Ms. Dau's constitutional rights. Accordingly, CFMG is not entitled to summary judgment on any other aspect of this claim.

### 7. Causation

Defendants' final argument on Plaintiffs' deliberate indifference claim is one of causation. Specifically, Defendants argue Ms. Dau's death was the result of a heart attack, not any conduct on the part of Defendants. However, Defendants have failed to show there is an absence of a genuine issue of material fact on the cause of Ms. Dau's death. Indeed, the autopsy report states "an acute multiple drug intoxication ... contributed to [Ms. Dau's] death." (Zugman Decl., Ex. B.)

Furthermore, as the Ninth Circuit noted in *Gibson v. County of Washoe, Nev.*, 290 F.3d 1175, (9th Cir. 2002), "[d]eath was not the only injury [Ms. Dau] suffered at the hands of the County." *Id.* at 1192. Prior to her death, Ms. Dau was placed in a safety cell for four days, during which time she was not physically seen by a medical doctor despite her complaints of "pain everywhere." (Zugman Decl., Ex. D at 193.) Also, the autopsy reflected Ms. Dau had a "3 cm, stage II decubitus ulcer" on the middle of her lower back, (Zugman Decl., Ex. B), which Defendants fail to acknowledge, much less explain. As stated in *Gibson*, a plaintiff may recover for injuries sustained prior to death, not just their ultimate demise. Accordingly, Defendants' causation argument does not warrant summary judgment on Plaintiffs' deliberate indifference claim.

### C. Negligent Hiring, Training, Retention, Supervision and Control

Plaintiffs' second claim alleges Defendants Loera and Murguia were negligent in their hiring, training, retention, supervision and control of prison personnel. To prevail on this claim, Plaintiff must prove the following elements: (1) That an employee of the Sheriff's Department was unfit or incompetent to perform the work for which he was hired, (2) Defendants Loera and/or Murgui**a** knew or should have known that the employee was unfit or incompetent and that this unfitness or incompetence created a particular risk to others, (3) that the employee's unfitness or incompetence harmed Plaintiffs and (4) Defendants Loera and/or Murguia's negligence in hiring, training, retaining, supervising or controlling the employee was a substantial factor in causing Plaintiffs' harm. Judicial Council of California Civil Jury Instruction 426.

Defendants raise several arguments in support of their motion for summary judgment on this claim, but two are dispositive. First, as to Defendant Loera, Defendants argue there is no evidence that he knew or had reason to know that any of his employees were unfit or incompetent to perform the work for which they were hired. Defendants provide evidence to support this argument, (Decl. of Sheriff Raymond Loera in Supp. of Mot. ¶¶ 2-4), and Plaintiffs have failed to provide any evidence in response. Accordingly, Defendant Loera is entitled to summary judgment on this claim.

As to Defendant Murguia, Defendants argue there is no evidence he is an "employer" such that he can be held liable for negligent hiring, training, retention, supervision or control. Defendants provide evidence to support this argument, (Murguia Decl. ¶¶ 3-5), and Plaintiffs fail to provide any evidence in response. Accordingly, Defendant Murguia is also entitled to summary judgment on this claim.

**D.     California Government Code § 845.6**

Plaintiffs' next claim is for violation of California Government Code § 845.6. This statute provides:

> Neither a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but, except as otherwise provided by Sections 855.8 and 856, a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care.

Cal. Govt. Code § 845.6.

Defendants argue they are entitled to summary judgment on this claim for several reasons. First, they argue the statute is inapplicable to the County. However, Defendants fail to provide any authority to support this argument, and indeed, the plain language of the statute makes it applicable to public entities. Accordingly, the County is not entitled to summary judgment on this claim.

Second, Defendants argue Defendants Pacheco and Murguia did not know Ms. Dau was in need of immediate medical care, therefore they cannot be held liable for failing to provide that care. As explained above, however, there is a genuine issue of material fact as to the circumstances surrounding Ms. Dau's condition on the morning of her death. In light of that factual dispute, Defendants Pacheco and Murguia are not entitled to summary judgment on this claim.

1	Defendants' final argument on this claim is that Defendants Singh and Baker are entitled to
2 summary judgment because neither was present nor involved in Ms. Dau's care on the morning of her
3 death.  Although there is no dispute about that fact, there remains a factual dispute as to whether Ms.
4 Dau was in need of immediate medical care on July 20, 2011, when Dr. Singh was allegedly notified
5 of her placement in the safety cell.  There is also a factual dispute as to whether Ms. Dau was in need
6 of immediate medical care on July 21, 2011, when Dr. Baker saw her over video feed.  Therefore,
7 these Defendants are, likewise, not entitled to summary judgment on this claim.

8	**E.	Substantive Due Process**

9	Plaintiffs' final claim alleges a violation of Ms. Hall's substantive due process rights.  "'It is
10 well established that a parent has a fundamental liberty interest in the companionship and society of
11 his or her child and that the state's interference with that liberty interest without due process of law
12 is remediable under 42 U.S.C. §1983.'"  *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004)
13 (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001)).  "To violate substantive due
14 process, the alleged conduct must 'shock[ ] the conscience' and 'offend the community's sense of fair
15 play and decency.'"  *Marsh v. County of San Diego*, 680 F.3d 1148, 1154 (9th Cir. 2012) (quoting
16 *Rochin v. California*, 342 U.S. 165, 172-73 (1952)).

17	Here, Defendants argue they did not engage in any conduct that "shocks the conscience."  In
18 support of this argument, they rely on the individual Defendants' provision of medical care to Ms. Dau
19 and their eventual transportation of Ms. Dau to the hospital.  However, when the facts as a whole are
20 construed in Plaintiffs' favor, there remains a genuine issue of material fact as to whether Defendants
21 engaged in conscience-shocking conduct.  Those facts reflect Ms. Dau was placed in a safety cell and
22 provided with no medical treatment save for medications for pain and alleged psychosis.  She was
23 repeatedly observed lying naked in her cell, and after her death, was found to have a "3 cm, stage II
24 decubitus ulcer" on her lower middle back.  (Zugman Decl., Ex. B.)  On the morning of her death, one
25 officer commented that Ms. Dau "looked dead," yet she was transported to the hospital in a custody
26 van with no medical personnel or equipment save for a first aid kit.  She was pronounced dead shortly
27 thereafter.  These facts are sufficient to raise a genuine issue as to whether Defendants engaged in
28 / / /

1 conduct that "shocks the conscience." Accordingly, Defendants are not entitled to summary judgment
2 on this claim.

### III.

### CONCLUSION

For these reasons, the Court grants in part and denies in part Defendants' motion for summary judgment. Specifically, the Court grants the motion as to Plaintiffs' claim for deliberate indifference against the County to the extent it relies on an alleged policy of failing to supervise the provision of medical care by CFMG and a policy of failing to train its officers. The Court also grants the motion on Plaintiffs' claim for deliberate indifference against CFMG to the extent it relies on an alleged policy of failing to provide coverage for Dr. Singh when he is unavailable. The Court also grants the motion as to Plaintiffs' claim for negligent hiring, training, retention, supervision and control. The Court denies the motion as to the remaining claims.

**IT IS SO ORDERED**.

DATED: May 24, 2013

_____
HON. DANA M. SABRAW
United States District Judge